764 So.2d 14 (1999)
ATLANTIC GULF COMMUNITIES CORPORATION, a Delaware corporation, Appellant/Cross-Appellee,
v.
CITY OF PORT ST. LUCIE, a Municipal corporation, Appellee/Cross-Appellant.
No. 97-3330.
District Court of Appeal of Florida, Fourth District.
March 10, 1999.
Order Denying Rehearing and Clarification May 12, 1999.
*15 Harold G. Melville of Melville & Sowerby, P.A., Fort Pierce, for appellant/cross-appellee.
Roger G. Orr, City Attorney, and Pam E. Booker, Assistant City Attorney, Port St. Lucie, for appellee/cross-appellant.
GROSS, J.
The primary issue we address in this case is whether the City of Port St. Lucie ("City") was authorized to use the uniform method for the levy, collection, and enforcement of non-ad valorem assessments set forth in section 197.3632, Florida Statutes (1997), to collect certain stormwater utility fees authorized by Chapter 403, Florida Statutes (1997). We hold that although the City had the authority to use the uniform method, its failure to follow the mandatory notice and hearing procedures of section 197.3632(4) precluded it from using that method of collection and enforcement during the years at issue in this case.
Prior to 1986, the City funded its stormwater management system through a series of special assessment districts. In 1986, the City abandoned these districts and passed Ordinance 86-131, which established a citywide stormwater utility system. The city council established a policy that all property in the City contributed to the need for a stormwater utility; therefore all property in the City was to be charged a stormwater utility fee. The ordinance was passed pursuant to section 403.0893(1), Florida Statutes (1997), which authorized the City to
[c]reate one or more stormwater utilities and adopt stormwater utility fees sufficient to plan, construct, operate, and maintain stormwater management systems set out in the local program required pursuant to s. 403.0891(3).
Section 403.031(17), Florida Statutes (1997), defines a "stormwater utility" as
the funding of a stormwater management program by assessing the cost of the program to the beneficiaries based on their relative contribution to its need. It is operated as a typical utility which bills services regularly, similar to water and wastewater services.
Ordinance 86-131 set a schedule of fees and authorized the city manager to send statements to record owners of property. The ordinance provided that the stormwater utility fee constituted a lien against property. Port St. Lucie Ord. No. 86-131, Section 3.B. Under the ordinance, collection of delinquent charges was to be "the same as for collection of assessments as provided by Chapter 173, Florida Statutes." Id. Chapter 173 authorizes a foreclosure suit in circuit court as the method for collecting delinquent assessments.
In 1988, the City retained the engineering firm of Camp, Dresser & McKee, Inc. ("CDM") to review Port St. Lucie's existing stormwater utility rate policy and to make recommendations concerning changes to the policy. CDM submitted its report in 1988 and the City adopted the report's recommendations through Ordinance 88-32.
In its report, CDM determined that the predominant unit of property within the City was a single family residential lot. CDM also found that the typical residential lot had 11,745 square feet of total area and that the typical home on such lot has 2,280 square feet of impervious surface area. CDM designated this typical home and lot as the equivalent residential unit ("ERU") within the City. CDM recommended the imposition of a stormwater fee utilizing the ERU as the basic billing unit. *16 The number of ERU's to be assigned to a particular lot was based upon the amount of stormwater runoff potential assigned to that parcel. For example, if a lot generated twice the amount of stormwater runoff as did an ERU, that parcel would be assigned 2 ERU's.
CDM recommended that since vacant, single family residential lots had 75% of the runoff potential of an ERU, each vacant residential lot should be assessed .75 ERU. As to undeveloped tract and acreage parcels, CDM proposed that the number of ERU's assigned to such parcels be calculated by dividing the total land area of the parcel by the land area of an ERU, and then multiplying the result by .75 ERU. Once the City determined the amount of the stormwater utility budget for a given year, the total budget was divided by the total number of ERU's in the system and each property owner was billed for the number of ERU's assigned to the owner's parcel multiplied by the applicable dollar per ERU charge.
In 1988, 1991, and 1992, the City issued stormwater utility revenue bonds to pay for the implementation of the stormwater utility system. All three bond issues were validated pursuant to Chapter 75, Florida Statutes. The stormwater utility fees were the revenue pledged to repay those bonds.
From 1986-90, the City operated the stormwater utility as a typical utility which sent bills to property owners on a periodic basis. Beginning in the 1990/91 fiscal year, the City changed this procedure and began to use the uniform method for the levy, collection, and enforcement of non-ad valorem assessments set forth in section 197.3632, Florida Statutes (1997). Port St. Lucie Resolution No. 89-R70. Chapter 197 provides that delinquent assessments may be collected by the "issuance and sale of tax certificates and tax deeds for nonpayment." See §§ 197.3632(8)(a), 197.432-197.562, Fla. Stat. (1997).
The parties agree that the City complied with the procedural requirements of section 197.3632 for the 1990 tax year. For subsequent years, no further written notice was provided to landowners and no public hearing was held prior to the assessment of that year's fees. The City's stormwater utility fees are assessed according to a fiscal year that runs from October 1 of each year to September 30 of the following year. The City sets the fees for the upcoming year and then provides that information to the tax collector's office, which includes the fees as a non-ad valorem assessment that appears as a special line item on the tax bill mailed to taxpayers in November of each year.
In 1992, the City unified the rate between vacant single family residential lots and developed single family residential lots by increasing the charge for the vacant lots to 1.0 ERU per lot. Beginning in 1993, the City elected to charge a higher fee per ERU for vacant property than for developed property. The initial difference of $6.53 per ERU was for the annual maintenance charge to clean the swale liners installed in front of vacant lots. This additional fee reflected that home owners typically maintain the swale areas in front of their properties. However, the higher fee was also charged for undeveloped and tract parcels that did not have swale liners and for vacant lots where no swale liner had been installed.
In 1995, Atlantic Gulf Communities Corporation ("Atlantic") was the largest owner of vacant or undeveloped property in the City, owning about 4,100 acres of land; approximately 2,100 vacant single family lots were located on improved streets and 3,400 vacant platted single family lots were on unimproved streets where there were no roads, swales, or drainage systems. All of the property Atlantic owned was vacant and undeveloped.
For the 1995/96 fiscal year, Atlantic's stormwater utility fees totaled $997,671.34. Atlantic hired the engineering firm of Dyer, Riddle, Mills & Precourt, Inc. ("DRMP") to study the fees and prepare a *17 report. The report concluded that Atlantic's properties were being substantially overcharged compared to developed properties in the City.
Following the requirements of section 51.08 of the City Code, Atlantic paid all of its assessed taxes in November, 1995, and then filed an appeal regarding the stormwater utility fees with the city manager. The city manager denied the appeal. Atlantic then appealed to the city council. After a quasi-judicial hearing, that appeal was denied. Atlantic then filed a petition for writ of certiorari in the nineteenth judicial circuit seeking review of the city council's decision. Separately, Atlantic filed a declaratory judgment action challenging the validity of the City's stormwater utility system code and the assessments levied pursuant to the code. The certiorari action was abated pending resolution of the declaratory judgment action.
The case was tried as a bench trial over five days in June, 1997. The trial court concluded that the stormwater utility code, "from an overall standpoint ... [was] not arbitrary, capricious, unreasonable or in direct conflict with Chapter 403." The judge concluded that the non-ad valorem assessments levied against Atlantic in 1995/96 and 1996/97 were valid and not violative of the provisions of section 197.3632, Florida Statutes (1997). However, the court also found that certain provisions of the code were distinct and severable and that these portions were "arbitrary, capricious and unreasonable." The court held to be arbitrary the City's policy of charging an annual $7.00 per ERU maintenance fee for the cleaning of swale liners, where no swale liners existed. The court also ruled that the change in the code from .75 ERU's to 1.0 ERU's for vacant platted single family residential lots was arbitrary and not based on relative contribution to need. For these specific items, the court ordered a refund for the two tax years in question. Atlantic appealed and the City cross-appealed the final judgment entered on August 27, 1997.

I
Atlantic first argues that the City's stormwater utility may not use the method set forth in section 197.3632, Florida Statutes (1997), to collect its fees. The contention is that the statutory definition of a "stormwater utility" provides that it is to be "operated as a typical utility which bills services regularly, similar to water and wastewater services." § 403.031(17), Fla. Stat. (1997). Atlantic interprets the statutory authorization to use Chapter 197 collection methods to apply only to subsection (3) of section 403.0893, Florida Statutes (1997), which provides for the creation of stormwater management system benefit areas.
We agree with the City's interpretation of the statute. Section 403.0893 contains three subsections. Each subsection describes a different funding mechanism which a local government might use for a stormwater system. Subsection (1) provides for the creation of "one or more stormwater utilities" and the adoption of "stormwater utility fees." Subsection (2) deals with the setting aside of a "continuing source of revenue." Subsection (3) covers the creation of stormwater management system benefit areas. At the end of the long paragraph under subsection (3) is the following sentence:
For fees assessed pursuant to this section, counties or municipalities may use the non-ad valorem levy, collection, and enforcement method as provided for in chapter 197.
§ 403.0893, Fla. Stat. (1997) (emphasis supplied). The use of the term "section" refers to section 403.0893 in its entirety, and not just to the paragraph contained in subsection (3). The plain and ordinary meaning of the term "section," when used in reference to a Florida statute, refers to the distinct, bold numbered and titled subdivisions contained in the bound volumes of the Official Florida Statutes. *18 The numbered or lettered divisions of these statutory sections are typically called "subsections." In drafting other statutes, the legislature has used the terms "section" and "subsection" consistently with these meanings. See, e.g., §§ 196.1975(4)(b) & (6), 215.422(2), Fla. Stat. (1997).
Atlantic cites to Nikolits v. Nicosia, 682 So.2d 663 (Fla. 4th DCA 1996), to support its contention that the non-ad valorem method of collection applies only to subsection (3) of section 403.0893, and not to subsections (1) and (2). Nikolits is distinguishable since it deals with language included in one section of a statute (section 101.141, Florida Statutes) that is omitted from another section (section 101.151, Florida Statutes) and not with the wording of two subsections of the same statutory section.

II
Atlantic next argues that for assessments after the 1990/91 tax year, the City failed to follow the procedural safeguards required by section 197.3632 in order for the City to utilize the uniform method for the levy, collection, and enforcement of non-ad valorem assessments.
In August, 1990, the City sent out a notice to property owners subject to the stormwater fees. An exemplar of the notice, as it applied to one particular parcel, was introduced in evidence below. The first paragraph of the notice provided:
Notice is hereby served that the city council of Port St. Lucie, Florida, will use the uniform method of assessing, billing and collecting stormwater fees. The purpose of the stormwater system is to maintain and improve drainage in the city. The city has established a fee of $40.00 for one year for one equivalent residential unit (ERU). The ERU is the average impervious area for a single family residence and is equal to 2,280 square feet. It is the base unit of measurement as it represents the largest uniform class of developed property. The fee is based on a comparison of a property's ability to generate runoff and the runoff generated by an average developed single family residence parcel.
The ERU unit(s) calculated for the above referenced
Parcel is: 0000.75
For which the City will assess: $30.00
This is the stormwater amount which will appear on the "non-ad valorem" portion of the 1990 tax bill, and will be levied and collected in the same manner as ad valorem taxes by the tax collector of St. Lucie County. Failure to pay any assessment when due will result in the sale of a tax certificate against the affected property and may subject the property owner to loss of title to the property.
The second paragraph of the notice advised of the right to file written objections and to attend a public meeting of the city council concerning the assessments. By Resolution No. 90-R45, the City certified the non-ad valorem assessment roll for stormwater utility user fees to the tax collector of St. Lucie County.
Since the 1990/91 assessment, the City has raised the fee each year, and in one year changed the formula for determining the assessment. The table set forth below demonstrates the changes that have occurred since the 1990/91 assessment:

Fiscal Year Amount of Assessment
1990/91 $40 per ERU
 (Vacant lots charged .75 ERU)
1992/93 $49 per ERU
 (Vacant lots charged 1.0 ERU)
1993/94 $53 per ERU-Developed
 $59.53 per ERU-Undeveloped
 (Vacant lots charged 1.0 ERU)
1994/95 $55 per ERU-Developed
 $62 per ERU-Undeveloped
 (Vacant lots charged 1.0 ERU)
1995/96 $67 per ERU-Developed
 $74 per ERU-Undeveloped
 (Vacant lots charged 1.0 ERU)
1996/97 $69.48 per ERU-Developed
 $77.48 per ERU-Undeveloped
 (Vacant lots charged 1.0 ERU)

Atlantic concedes that the City complied with the procedural requirements of section 197.3632 for the 1990/91 assessment, *19 but argues that the City was also required to comply with the statute in the later years when the fees were raised. The City contends that the notice and hearing provisions of the statute were inapplicable after the 1990/91 assessment. The City's stormwater utility system code provides for the establishment of the fee on an annual basis by resolution and does not establish a maximum fee.
Section 197.3632(4) creates a procedural mechanism to give taxpayers notice of certain non-ad valorem assessments and the opportunity to be heard prior to the inclusion of the assessments on the annual tax notice. See Escambia County v. Bell, 717 So.2d 85, 86-87 (Fla. 1st DCA 1998). A public hearing provides tax dissenters with a forum to voice their opposition and an opportunity to influence the political process by mustering support for their views. Under the statute, the City was required to provide written notice and a public hearing for those assessments levied after the 1990/91 tax year.
Section 403.0893 permits the City to use the non-ad valorem levy, collection, and enforcement method "as provided for in chapter 197." Section 197.3632(4)(a) provides that a local government "shall adopt a non-ad valorem assessment roll at a public hearing" if one of the following applies:
1. The non-ad valorem assessment is levied for the first time;
2. The non-ad valorem assessment is increased beyond the maximum rate authorized by law or judicial decree at the time of initial imposition;
3. The local government's boundaries have changed, unless all newly affected property owners have provided written consent for such assessment to the local governing board; or
4. There is a change in the purpose for such assessment or in the use of the revenue generated by such assessment.
A "taxing statute should always be construed in the light most favorable to the taxpayer." Mikos v. Ringling Bros., Barnum & Bailey Combined Shows, Inc., 497 So.2d 630, 632 (Fla.1986) (citations omitted). Applying this rule of construction, subsection 197.3632(4)(a)1 comes into play when the amount of an assessment is raised or the methodology for determining the assessment is changed from that which was approved at a previous public hearing set under the statute.[1] "The non-ad valorem assessment" refers to the precise assessment described in the notice to the taxpayer required under section 197.3662(4)(b). In this case, each time the stormwater fee was increased or the rate of ERU applied to vacant lots was modified, such new assessment was "levied for the first time" within the meaning of the statute, thereby triggering the notice and hearing provisions of the statute.
This reading of the statute is supported by the contents of the notice of public hearing required by section 197.3632(4)(b). That subsection states that the mailed notice "shall include:"
the purpose of the assessment; the total amount to be levied against each parcel; the unit of measurement to be applied against each parcel to determine the assessment; the number of such units contained within each parcel; the total revenue the local government will collect by the assessment; a statement that failure to pay the assessment will cause a tax certificate to be issued against the property which may result in a loss of title; a statement that all affected property owners have a right to appear at the hearing and to file written objections with the local governing board within 20 days of the notice; and the date, time, and place of the hearing.
§ 197.3632(4)(b), Fla. Stat. (1997) (emphasis supplied). The notice requires disclosure of the "total amount to be levied *20 against each parcel" and the methodology for calculating the total amount. The mandatory content of the notice fulfills the statutory intent that taxpayers know how much they will be required to pay and for how long. Without such information, a taxpayer cannot make an informed decision on whether to oppose the tax, campaign for amendments, or silently accede to it. The notice also requires specification of the purpose of the assessment and the "total revenue" the local government will collect by the assessment; this allows a taxpayer to assess the financial propriety of the government project and evaluate the fiscal burden imposed on each taxpayer.
The statute differentiates between the decision to use the non-ad valorem method of assessment and the actual levy of a particular assessment. Section 197.3632(3)(a) requires that the election to use the uniform method "for the first time" be by resolution adopted at a public hearing, after a notice published for four consecutive weeks prior to the hearing. It is illogical to read the different notice provisions of subsection (4) to apply to the same factual scenario as subsection (3)(a). In addition, section 197.3632(6) contemplates the situation where the notice provisions of subsection (4)(a) might be dispensed with:
If the non-ad valorem assessment is to be collected for a period of more than 1 year or is to be amortized over a number of years, the local governing board shall so specify and shall not be required to annually adopt the non-ad valorem assessment roll.
The 1990/91 notice in this case disclosed a one year non-ad valorem assessment of $40.00 per ERU. Vacant lots were to be assessed at .75 ERU's. There was no indication that the assessment was for multiple years. The subsequent assessments, which differed by their increased amount or method of computation, were "levied for the first time" within the meaning of section 197.3632(4)(a)1, such that compliance with the notice and hearing provisions of the statute were mandatory.
The City argues that the words in the notice "for one year" should be read to mean "per year." Such a construction would impermissibly rewrite the notice and does not address the problem posed by the increases in the fees beyond the $40.00 per ERU specified in the notice. The City next contends that its stormwater utility code "provides for the establishment of the fee on an annual basis by resolution and does not establish a maximum fee." This contention confuses the authority to make the assessment, which is not at issue, with the requirement that the City exercise its authority in compliance with statutory procedures concerning notice and the opportunity to be heard, if the City desires to use the method of collection provided for in section 197.3632. The code provision does not override section 197.3632(4) and give the City the power to perpetually increase non-ad valorem assessments without providing a notice and public hearing.
The City asserts that section 197.3632(4)(c) permits the City to "increase the fees assessed on the affected properties based upon the benefits the City has provided or will provide to the stormwater system, without requiring another public hearing, so long as the rate adjustment did not exceed the maximum rate authorized by law or judicial decree at the time of initial imposition." However, that subsection refers to adjustments that might be made at a public hearing noticed pursuant to subsection (4)(b) of the statute.
Finally, we reject the City's argument that the bond validation proceedings somehow impacted the issues raised in this case, which are collateral to the subject matter of bond validation lawsuits. See Noble v. Martin County Health Facilities Auth., 682 So.2d 1089, 1090 (Fla.1996); DeSha v. City of Waldo, 444 So.2d 16 (Fla.1984). Steinberg v. City of Sunrise, 592 So.2d 1148 (Fla. 4th DCA 1992), is *21 distinguishable. That case involved a challenge to the city's constitutional or statutory authority to make an assessment for special assessment bonds. This issue had been specifically adjudicated in the bond validation proceeding. The statutory compliance issues raised in this case were not part of the proceedings that validated the utility revenue bonds.
Because it failed to comply with the procedural requirements of section 197.3632(4), the City was precluded from collecting the stormwater fee by utilizing the uniform method for the collection and enforcement of non-ad valorem assessments. Having timely objected to the 1995/96 and 1996/97 assessments, Atlantic is entitled to a refund of the amounts paid pursuant to the tax bills for those years.
As to the remaining issues on the appeal and cross-appeal, we affirm the trial court's considered final judgment.
DELL and SHAHOOD, JJ., concur.

ON MOTION FOR REHEARING AND CLARIFICATION
PER CURIAM.
The motion for rehearing and clarification is denied. That portion of the motion based on Gulesian v. Dade County School Board, 281 So.2d 325 (Fla.1973), and its progeny was not previously raised in the trial court or in this appeal. This opinion does not rule on whether the City may recover any portion of the utility fees at issue by another method of collection. See Port St. Lucie Ordinance Number 92-23, § 5(E).
DELL, SHAHOOD and GROSS, JJ., concur.
NOTES
[1] We do not reach the issue of whether the notice and hearing provisions are triggered when an assessment does not increase from the previous year, but the previous year's notice did not specify that it was to cover more than one year's assessment.